512 S.E.2d 189

**STATE of West Virginia, Appellee,**

v.

**Gregory Dale BOGGESS, Appellant.**

No. 24979.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 15, 1998.

Decided Dec. 8, 1998.

Thomas J. Gillooly, Esq., Charleston, West Virginia, Attorney for the Appellant.

William C. Forbes, Esq., Prosecuting Attorney for Kanawha County, Jon R. Blevins, Esq., Assistant Prosecuting Attorney, Charleston, West Virginia, Attorneys for Appellee.

1. Also referred to as "Terry's Place."

PER CURIAM:

This case is before the Court upon the appeal of the Appellant, Gregory Dale Boggess, arising out of the January 14, 1997, final order of the Circuit Court of Kanawha County sentencing the Appellant to life imprisonment with a recommendation of mercy for first degree murder following a jury trial. The Appellant argues that the trial court: 1) abused its discretion by refusing to give the Appellant's proposed instructions numbered 1, 2 and 3, which were legally correct instructions on the Appellant's theory of provocation and self-defense; 2) abused its discretion by prohibiting the Appellant from calling the victim's former girlfriend to testify regarding the victim's character for aggressiveness and violence, in support of the Appellant's claim of self-defense; 3) abused its discretion by abruptly cutting short, and then striking, the testimony of a defense witness impeaching a key prosecution witness with a prior inconsistent statement; and 4) erred by failing to direct a verdict for the Appellant on the first and second degree murder charges. Based upon our review of the record, the parties' arguments, and all other matters submitted before this Court, we find that no error was committed by the lower court and, therefore, affirm the lower court's decision.

I.

On July 28, 1995, the victim, Donald Boylen, was drinking and playing pool at a bar located on West Washington Street in Charleston, West Virginia, called "Rocky's Place," with his fiancee, Cheryl Goff. The Appellant was at another bar called "Terry's Bar," [1] which was also located in the same vicinity as Rocky's Place in Charleston. The Appellant owned Terry's Bar and his wife operated it. Sometime after 10:30 p.m. that day, the Appellant walked over to Rocky's Place with a friend, Faye Burdette. The Appellant proceeded to the bathroom located at the rear of the bar. Rocky Combs, the owner and operator of Rocky's Place, testified that he had earlier informed the Appellant that he was banned from the bar. Thus, when the Appellant exited the bathroom, Mr. Combs, who was standing with the victim,

told the Appellant that he had to leave and that he knew he was not welcome in the establishment.

Mr. Combs stated that the Appellant became enraged by what he told him. According to Mr. Combs, as the Appellant was leaving and standing in the doorway he threatened, "I'll be back and I've got something for everyone of you S.O.B.'s, especially that fat S.O.B. right there," pointing at the victim. Concerned with this threat, Mr. Combs then flagged down a passing police car and informed Officer Brent Webster of the Charleston Police Department.

The Appellant returned to Terry's Bar. While there, he retrieved a loaded .38 caliber handgun. At about 11:30 p.m., the Appellant went back to Rocky's Place with the gun and his adult son, Chris Boggess. Rocky Combs testified, that upon his return, he once again informed the Appellant and his son that they were not welcome and they needed to leave.[2] The victim's fiancee, Cheryl Goff, stated that the Appellant's son began cussing at the victim. Mr. Combs further testified that the Appellant's son told the victim that "[m]y dad wants you outside." The Appellant then motioned for the victim to come towards him. William Shane, a patron in Rocky's Place, also testified that the Appellant's son stated to the victim to "[c]ome on." Ms. Goff testified that, at first, the victim did not respond to the taunts. According to Ms. Goff, it was not until the Appellant's son called her a "whore" that the victim responded and followed the Appellant and his son outside. Other patrons also went outside.

Ms. Goff testified that she was fearful that the victim might be attacked, so she picked up a pool stick and carried it outside with her. She stated that once they were outside on the sidewalk, the Appellant and his son backed up in the street a few feet stating to the victim to "[c]ome on." According to Ms.

Goff, the victim then told the Appellant "[i]f you want to whip me, here I am," and the victim proceeded forward toward the Appellant and his son.

According to Ms. Goff's testimony, an altercation then occurred between herself and the Appellant's son. During this altercation, Ms. Goff struck the Appellant's son with the pool stick. The victim then took the pool stick and broke it over his knee and tossed it to the side. At that point, according to Ms. Goff, the Appellant's son picked up a piece of the pool stick and struck her with it. Seeing his fiancee hit, the victim threw the Appellant's son to the ground and as the victim raised up, the Appellant fired the .38 caliber revolver sending a bullet into the victim's shoulder. This shot struck a major blood vessel. The victim, however, got up and staggered, and then the Appellant fired a second shot which struck the victim in the head, killing him.[3]

Ms. Goff testified that after the Appellant shot the victim, the Appellant "[t]urned and walked back up the street." According to Ms. Goff, this was after the Appellant pointed the gun at her and stated "[c]ome on bitch, I'll shoot you too." Upon returning to his bar, the Appellant tossed the .38 caliber revolver onto the roof of his establishment.

The Appellant presented evidence of self-defense and provocation. He testified that upon entering Rocky's Place the first time on the day of the shooting, he went directly into the men's room, which was located at the rear of the bar. According to the Appellant, the victim followed him into the men's room and assaulted him there.[4] Additionally, the Appellant testified that he did nothing to provoke the assault and that after the assault, the victim stated that "he was going to kill me." While other witnesses for the Appellant, including Margaret J. Coen, Ronald E. Combs and Carolyn Combs, all corrobo-

---

2. While witnesses disagreed as to whether the Appellant entered Rocky's Place on this second occasion, or remained at the door, the Appellant's son did enter the bar. Further, the Appellee presented the testimony of several witnesses who corroborated Mr. Comb's testimony that the Appellant was asked to leave upon his return to Rocky's Place.

3. Dr. Irwin Sopher, the Chief Medical Examiner for the State of West Virginia, testified that either shot would have resulted in the victim's death.

4. The Appellant testified that the victim "grabbed [him] around the throat, jerked [him], hit [him] in the side, turned [him] around and kneed [him] in the groin."

rated the Appellant's testimony that the victim followed the Appellant into the men's room, none of them testified that they witnessed the victim assault the Appellant.[5] The Appellant testified that upon leaving the restroom, he immediately exited the bar, without anyone telling him to leave. He denied ever threatening the victim.

The Appellant testified that he returned to Terry's Bar. While at Terry's Bar, the Appellant stated that he collected the sales receipts and other monies from the bar so that he could go home. According to the Appellant, because he was carrying between $2,000 and $3,000 in cash, he had taken his pistol from behind the bar to have it with him when he left with the money. The Appellant stated that this was his usual practice when he carried large amounts of cash. The Appellant testified that he was joined by his son, Chris, as well as his friend, Jamie Wilson, as he left the bar. The Appellant stated that he proceeded to return to Rocky's Place, because he was upset over what had occurred earlier and he wanted to tell Rocky "to stay out of my bar and I would stay out of his bar." He also testified that he told his son and Jamie Wilson that he did not want to start any trouble.

The Appellant stated that upon returning to Rocky's Place, he proceeded to the bar and told Rocky what he set out to tell him. At that point, the Appellant testified that Mr. Combs told the Appellant to get out of his bar and told the Appellant that he was not welcome in Rocky's Place. According to the Appellant, he was trying to leave Rocky's Place as requested when "a large crowd of people started coming out the door and just started circling around me...." The Appellant testified that he had no idea why the people were coming out of the bar at that point.

The Appellant stated that once outside the bar, his son came running over and got in front of him and yelled "Dad. You're not going to hit my dad[.]" Then, according to the Appellant, he noticed the victim with a pool stick. The Appellant testified that the victim struck his son with the broken section of the pool cue several times and also with his fists. The victim then advanced on the Appellant holding the pool cue. The Appellant stated that the victim poked him in the side and struck him twice in the side of the head. It was after the victim struck him that the Appellant fired his pistol at the victim, when the victim was positioning himself to hit the Appellant's son again. The Appellant further testified that after the first shot was fired, the victim continued to advance on him and when the victim reared back to strike him again, he fired a second shot. The Appellant denied that he ever threatened or taunted the victim once outside of the bar. Further, the Appellant testified that he was always retreating away from the bar once he was outside.[6]

## II.

## JURY INSTRUCTIONS

▆ The Appellant claims the trial court erred in denying three jury instructions[7]

---

**5.** It is significant to note that the Appellant testified that a confrontation between himself and the victim had occurred several months before the shooting. The Appellant testified that the victim had initiated the previous confrontation. Evidence of an affair between the victim and the Appellant's wife was also introduced at trial.

**6.** Other witnesses, including Douglas Hill, a patron in Rocky's Place, and the Appellant's son, corroborated the Appellant's testimony that he was backing away from Rocky's Place.

**7.** Based upon the above-mentioned theories, the Appellant sought the following instructions:
 DEFENDANT'S INSTRUCTION NO. 1
 The Court instructs the jury that a sudden intentional killing with a deadly weapon by one, who is not in any way at fault, in immedi-

ate resentment of a gross provocation is presumed to be a killing in heat of blood and therefore, even if not justified, is an offense of no higher degree than voluntary manslaughter.
 DEFENDANT'S INSTRUCTION NO. 2
 The Court instructs the jury that when there is a quarrel between two or more persons and both or all are at fault, and the combat as the result of such quarrel takes place and death ensues as a result, in order to reduce the offense to killing in self-defense, two things must appear from the evidence and circumstances in the case:
 FIRST, that before the mortal shot was fired, the person firing the shot declined further combat, and retreated as far as he could with safety; and

submitted by the Appellant's counsel relative to the Appellant's theory of the case, specifically, provocation by the victim and self-defense.[8] The Appellant maintains that despite strong evidence of heat-of-passion circumstances, provocation by the victim, and self-defense by the Appellant, the trial judge refused three legally correct defense instruction which described the heart of the Appellant's theory of the case on provocation and self-defense.

In contrast, the Appellee contends that there was no abuse of discretion by the circuit court in refusing to give the Appellant's proposed jury instructions, for these instructions were either duplicative of the charge given by the lower court or were not supported by the evidence. Specifically, the Appellee argues that Appellant's instructions numbered one and two regarding the law of self-defense and provocation were fully embraced in the lower court's jury charge. Further, the Appellee asserts that the Appellant's instruction numbered three was not supported by the evidence because the Appellant himself denied that he had any malice or ill-will toward the deceased.

█ The lower court gave the following instructions regarding self-defense, provocation and the meaning of the term "malice," all of which the Appellant asserts are part of "the Court's broad [jury] charge [which] ignored the specific evidence to which the ju-

rors were required to apply the law." First, with regard to the meaning of the term "malice," [9] the lower court instructed:

> Malice is an essential element of Murder in the First Degree and Murder in the Second Degree. *The term "malice" as used in these instructions is defined as that condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which may be inferred from the acts committed or the words spoke.*
>
> The word "malice" is used in a technical sense and included not only anger, hatred and revenge, but every unlawful and unjustifiable motive.
>
> *"Malice"* is not confined to ill will or to any one or more particular persons, but *is intended to denote an action flowing from a wicked or corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended by circumstances showing such a reckless disregard for human life as to necessarily include a formed designed against the life of another....* (Emphasis added.)

The lower court also gave the following instruction on self-defense:

> In this case, evidence has been offered that although Gregory Dale Boggess shot and killed Donnie Boylen with a gun, he

---

SECOND, that he necessarily killed the deceased in order to preserve his own life or to protect himself from great bodily harm.
DEFENDANT'S INSTRUCTION NO. 3
The Court instructs the jury that the right of self-defense is not impaired by malice upon the part of the accused against the deceased to kill a deceased or inflict great bodily harm upon him if such malice, is not accompanied by an overt act which is indicative of a wrongful purpose or calculated to provoke an attack.

8. The Appellant's theory was: 1) the victim had attacked the Appellant earlier in the evening—but even if the jury believed that the Appellant was initially the aggressor, the Appellant had thereafter withdrawn from the confrontation; 2) the Appellant did not provoke the sidewalk confrontation, although there was bad blood between the Appellant and the victim before the shooting; 3) the Appellant attempted to retreat from the sidewalk confrontation; and 4) the Appellant was in reasonable apprehension of death or serious bodily injury when he fired the gun.

9. The Appellant sought by the proposed instruction numbered three to make clear that his right to self-defense was not impaired simply by the fact that there was evidence introduced which indicated that the Appellant and the victim had ill-will towards each other prior to the incident. As we stated in *State v. Bowyer*, 143 W.Va. 302, 101 S.E.2d 243 (1957):

> The right of self-defense is not impaired by malice upon the part of an accused against a deceased by mere intention or preparation by an accused to kill a deceased or inflict great bodily harm upon him if such malice, intention, or preparation is not accompanied by over acts which are indicative of a wrongful purpose or are calculated to provoke an attack.

*Id.* at 313, 101 S.E.2d at 249. As discussed *infra,* we conclude that the trial court's jury charge regarding malice substantially covers this defense theory.

did so in self defense, and therefore the killing was justified and should be excused.

*The law of self defense is that if Gregory Dale Boggess was not the aggressor, and he had reasonable grounds to believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to stand his ground without retreating and repel force with force and to use "deadly force" in order to defend himself.*

. . .

If evidence of self defense is present, the State must prove beyond a reasonable doubt that Gregory Dale Boggess did not act in self defense. If you find that the State has failed to prove beyond a reasonable doubt that Gregory Dale Boggess did not act in self defense, you must find him not guilty.

In other words, if you have reasonable doubt about whether or not Gregory Dale Boggess acted in self defense, your verdict must be not guilty. (Emphasis added.)

Finally, the trial court instructed the jury on the law of voluntary manslaughter as follows, which encompasses provocation:

VOLUNTARY MANSLAUGHTER is committed when any person unintentionally and without malice kills another person as the proximate result of doing an act in reckless disregard of the safety of others.

It is reasonable to infer that a person ordinarily intends to do that which he does or which is the natural or probable consequence of his knowing acts. The jury may draw the inference that a person intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonable have expected to result from any intentional act or conscious omission.

Any such inference drawn is entitled to be considered by the jury in determining whether or not the State has proved beyond a reasonable doubt the required criminal intent.

Accordingly, *if a man with a deadly weapon in his possession under circumstances which you do not believe afforded him excuse, justification or provocation for his conduct,* gives a fatal or lethal wound to a deceased, then in those circumstances, "malice" and "intent to kill" may be inferred from the intentional use of a deadly weapon. (Emphasis added.)

 We begin our discussion regarding the jury instructions given by reiterating the standard of review set forth in syllabus point four of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, as long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

*Id.* at 663–64, 461 S.E.2d at 169–70, Syl. Pt. 4. Further, we stated in syllabus point one of *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996) that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion." *Id.* at 281, 489 S.E.2d at 258, Syl. Pt. 1, in part. Accordingly, the issue we must decide, is "not whether the jury charge was faultless in every particular but whether the jury was mislead in any way and whether it had an understanding of the issues and its duty to determine those issues." *Id.* at 285, 489 S.E.2d at 262.

 In deciding whether the trial court erred in refusing to give the Appellant's proposed instructions, we find the following passage in *Hinkle* instructive:

[A]n instruction offered by the defense should be given if the proposed instruction: (1) is substantively correct, (2) is not covered substantially in the charge actually

delivered to the jury, and (3) involves an important issue in the trial so the trial court's failure to give the instruction seriously impairs the defendant's ability to effectively present a defense.

*Id.*

Applying the criteria in *Hinkle* to the present case, it is clear that the proposed instructions are substantively correct. In reviewing the proposed instructions against the instructions given by the trial court, however, we conclude that the proposed instructions are substantially covered in the charge given to the jury by the lower court. Finally, we conclude that the failure to give the respective proposed instructions in no way impaired the Appellant's ability to effectively present his defense to the jury. *See id.* Consequently, from a review of the entire record, we conclude that the jury was not misled in any way by the jury charge given and, accordingly, the lower court did not err in refusing to give the Appellant's proposed instructions.

## III.

### VICTIM AS AGGRESSOR

■ The Appellant asserts that the trial court erroneously prohibited the Appellant from calling the victim's former girlfriend, Debbie Nash, to testify to the victim's violent character.[10] The trial court, ruling that the evidence was inadmissible, found that such evidence would tend to "confuse the jury and only actually serve to have another trial on all those matters and of course, we all know that the deceased is not here to give his side

of the story between he ... and ... Debbie Nash." The Appellant argues the trial court misapplied the law. The Appellee argues that the circuit court did not abuse its discretion in excluding the witness' ˙ testimony. The Appellee further argues that if any error was committed it is harmless.

■ We have previously stated that "ordinarily a circuit court's evidentiary rulings are reviewed under an abuse of discretion standard. A party challenging a circuit court's evidentiary rulings has an onerous burden because a reviewing court gives special deference to the evidentiary rulings of a circuit court." *Gentry v. Mangum,* 195 W.Va. 512, 518, 466 S.E.2d 171, 177 (1995); *see* Syl. Pt. 6, *State v. Bass,* 189 W.Va. 416, 432 S.E.2d 86 (1993).

Rule 404 of the West Virginia Rules of Evidence allows the introduction of the victim's character as follows:

> Evidence of a pertinent trait of character of the victim of the crime, other than a crime consisting of sexual misconduct, offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor....

W. Va. R. Evid. 404(a)(2).

■ We interpreted Rule 404 in *Dietz v. Legursky,* 188 W.Va. 526, 425 S.E.2d 202 (1992), wherein this Court stated:

> Importantly, "the admission of *reputation evidence* [11] of the victim's character

---

**10.** Defense counsel made the following proffer regarding Debbie Nash's testimony:

that the individual [the victim] had on many occasions assaulted her, abused her, set upon her and struck her, broke her arm in multiple places.

On one occasion had attached his truck with a chain to the porch of her house and pulled it off, stalked her on the streets and done many and various things in the form of abusive and hostile and aggressive behavior and—however, we are not in the position to show that the defendant in this case was aware of the activities that engaged him, that is to say the victim, that engaged in toward this individual.

**11.** It is significant to note that in the *Dietz* case, the Court was addressing proof of the victim's

aggressive character through opinion testimony offered pursuant to West Virginia Rule of Evidence 405(a), when we˙ stated that the defendant's knowledge was unnecessary. There is a distinction where, as in the present case, specific instances of the victim's character for aggressiveness are offered pursuant to West Virginia Rule of Evidence 405(b). As Professor Cleckley states: "Rule 405(b) applies only when character or a character trait is an operative fact which under substantive law directly determines the legal rights of the parties." 1 Franklin ˙D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4–4(F)(1)(b) at 302 (3d ed.1994). In other words, character is not in issue in self-defense cases. "What is in issue is the reasonableness of the defendant's conduct in applying force ·to the victim. The victim's prior character is not an

under Rules 404(a)(2) and 405(a) renders knowledge of the character by the defendant unnecessary, since the evidence is offered merely to permit a jury to circumstantially infer that the victim was the aggressor." Cleckley, Sec. 6.2(F)(1) (1986, 1992 Supp.) .... ("Even if the accused was unaware of deceased's reputation, evidence of it may be introduced pursuant to Rule 404(a)(2).")

188 W.Va. at 532, 425 S.E.2d at 208 (Original emphasis omitted)(Emphasis Added). We further stated, however, that the admissibility of the character evidence of the victim is contingent upon "the probative value of such evidence ... not outweigh[ing]... the concerns set forth in the balancing test of Rule 403." [12] *Id.* at 533, 425 S.E.2d at 209.

In the present case, the trial court stated that it found the character evidence inadmissible because the Appellant did not know at the time of the alleged crime about the incidents to which Ms. Nash would testify. At first glance, it appears that the trial court's ruling with regard to this matter was a misapprehension of the law with regard to requiring knowledge by a defendant prior to the introduction of a victim's character for aggressiveness and violence as set forth by this Court in *Dietz.* *See* 188 W.Va. at 532, 425 S.E.2d at 208.

 A thorough examination of the trial court's ruling, however, clearly indicates that the trial court had real concerns that the introduction of the proffered character evidence was so prejudicial as to outweigh the probative value of the evidence under a Rule 403 analysis. Consequently, it is apparent that the trial court made the right ruling for the wrong reason. We have consistently held that "[t]his Court may, on appeal, affirm the judgment of the lower court when it

appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syl. Pt. 3, *Barnett v. Wolfolk,* 149 W.Va. 246, 140 S.E.2d 466 (1965); *see also Cumberland Chevrolet Oldsmobile Cadillac, Inc. v. General Motors Corp.,* 187 W.Va. 535, 538, 420 S.E.2d 295, 298 n. 4 (1992)(stating that "even if the reasoning of a trial court is in error ... we are not bound by a trial court's erroneous reasoning"); *State ex rel. Dandy v. Thompson,* 148 W.Va. 263, 274, 134 S.E.2d 730, 737, *cert. denied,* 379 U.S. 819, 85 S.Ct. 39, 13 L.Ed.2d 30 (1964)(stating in criminal context that "correctness of ... [trial court's] final action is the only material consideration, not the stated reasons for [the trial court's] taking such action"). Hence, even though, contrary to the trial court's reasoning, the evidence was relevant under West Virginia Rule of Evidence 404, the evidence still was properly excluded under West Virginia Rule of Evidence 403.[13] Therefore, we conclude that the trial court did not abuse its discretion in excluding the evidence in this case.

## IV.

### STRIKING IMPEACHMENT WITNESS' TESTIMONY

 The Appellant contends that the trial court erred in cutting short, then striking, a defense witness' testimony which was offered to impeach the testimony of a prosecution witness. According to the Appellant, after the defense rested and the Appellee did not put on a rebuttal case, the trial court granted him leave to put his investigator, John Casey, on the stand, over the Appellee's objection. The trial court allowed Mr. Casey

---

operative fact which *directly* determines the rights of the parties." *Id.* § 4–4(F)(1)(b) at 303. Consequently, according to Professor Cleckley, where the victim's bad character is being offered to show that the victim was the aggressor, as in the instant case, "the evidence must satisfy the prerequisites of Rule 404(a)(2) and Rule 405(a), and Rule 405(a) limits the form of character evidence to only reputation and opinion, thereby excluding specific instances." *Id* . § 4–4(F)(1)(b) at 304.

12. West Virginia Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

13. It was also properly excluded under West Virginia Rule 405(b).

to testify that the Appellee's witness, Shane Ransom, had told him prior to trial that just before the victim was shot, Mr. Ransom saw the victim advance on the Appellant brandishing and shaking a broken section of the pool cue. This statement differed from Mr. Ransom's testimony during trial, where he testified that the victim had thrown the pool stick down before the final encounter. Second, Mr. Casey was allowed by the trial court to describe a short visit he and the Appellant had made to the home of the defense witness Jamie Wilson, in order to rebut the implication of the prosecution's cross-examination of Mr. Wilson to the effect that the Appellant and Mr. Wilson were friends, or that they had perhaps discussed or planned his testimony on that occasion, or that the witness was biased in the Appellant's favor.

The Appellee maintains that the trial court did not err in stopping Mr. Casey's testimony and striking it from the record. The Appellee asserts that the witness failed to confine himself to the limited scope of testimony permitted by the trial court. Rather, the witness launched into a blatant hearsay reiteration of the Appellant's theory of the case and, therefore, violated the trial court's ruling.

 The circuit court's decision with regard to permitting this witness to testify and the subsequent termination of the testimony should be reviewed under an abuse of discretion standard. As this Court has previously noted: "Under Rule 611(a) of the *West Virginia Rules of Evidence* [1985], the trial judge has discretion to 'exercise reasonable control over the mode and order of interrogating witnesses in presenting evidence . . . .'; and in doing so, he must balance the fairness to both parties." Syl. Pt. 2, *Gable v. Kroger Co.*, 186 W.Va. 62, 410 S.E.2d 701 (1991).

The circuit court, in allowing Mr. Casey to testify, specifically limited the brief inquiry

to two area: 1) a prior inconsistent statement made to the Appellant's investigator; and 2) a description of a visit to a defense witness' home. During Mr. Casey's testimony regarding the prior inconsistent statement, the trial court admonished the defense counsel stating: "Mr. McIntyre [the Appellant's trial counsel], this question is not intended for him to elaborate in all the matters. I'm not real happy with the questions and answer we're having now . . . ." After this admonition by the lower court, the Appellant's attorney acknowledges on the record that the witness had exceeded the scope of examination permitted by the lower court. The Appellant's counsel also admonished the witness, who again proceeded to testify outside the scope. The trial court, after an in camera conference, noted that "Mr. Casey has been withdrawn as a witness. His last answer in its entirety and the questioning of him will be entirely disregarded by this jury and it will not factor into the decision of this case." [14]

Based upon our review of the record in this case, we find that the trial court did not abuse its discretion with regard to John Casey's testimony. Both the trial court and defense counsel admonished Mr. Casey to focus his answers on the two narrow lines of inquiry allowed by the trial court. Mr. Casey failed to heed the admonishments given and, accordingly, his testimony was appropriately stopped and stricken from the record by the trial court.

## V.

### DIRECTED VERDICT

 The Appellant argues that the trial court erred in failing to direct a verdict for the Appellant on the first and second degree murder charges. The Appellant maintains that under the principle of law on provocation announced in *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978),[15] the

---

14. During post-trial motions, the trial court explained its decision regarding the witness:

> But nonetheless, he violated what I had given you permission to do and for him to do, and even when admonished he continued on. When I tried to focus, he wouldn't focus, he continued in his sentence-by-sentence string of inadmissible non-related material and testimo-

ny, all of which I might add, was favorable to your client, but totally contrary to my order.
So I only had to assume that he was going out of his way, Mr. McIntyre, to introduce and take that opportunity to lob in about four or five grenades into the State's case.

15. In syllabus point two of *Kirtley*, we held that "[w]here a defendant is the victim of an unpro-

consistent evidence of the Appellant's retreat from the confrontation with the victim should have led the Court to direct a verdict as to first and second degree murder charges, thereby permitting the jury only to consider the manslaughter charge. The Appellee, however, maintains that the Appellant's argument ignores the fact that the evidence of the Appellant's retreat was contested by evidence that the Appellant was taunting and threatening the victim to come towards him.

■■■ The Appellant's argument is essentially one of whether there was sufficient evidence to direct a verdict in the Appellant's favor. We previously held in syllabus points one and three of *Guthrie* that

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

. . . .

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pts. 1 and 3.

We agree with the Appellee in this case that the Appellant's argument with regard to the trial court's directing a verdict on the first and second degree murder charges is premised solely upon the Appellant's view that the evidence was uncontroverted with regard to the Appellant retreating from scene. The simple fact that witnesses described the Appellant as "retreating" or backing away from the bar is pure semantics and does not necessarily equate to a "retreat" in the legal context of self-defense. When viewing the evidence in the light most favorable to the prosecution, as we are required to do, the Appellee presented the testimony of numerous witnesses who testified that the Appellant was taunting the victim to come towards him and, indeed, was not retreating from the situation. *See id.* Consequently, because there was sufficient evidence to submit the first and second degree murder counts to the jury, we conclude the trial court did not err.

Based upon the foregoing, the decision of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Justice McGRAW did not participate in the decision of this case.

voked assault and in a sudden heat of passion uses a deadly weapon and kills the aggressor, he cannot be found guilty of murder where there is no proof of malice except the use of a deadly weapon." 162 W.Va. at 249, 252 S.E.2d at 374.